# EXHIBIT A

Uploaded: 2023MAR28 16:20 Filed By:Bar# 75488 TSTRELKA Reference: EF-119860
E-Filed: 2023MAR28 DANVILLE CC TGHENDERSON at 2023APR03 15:45 CL23000235-00

**VIRGINIA:**

### IN THE CITY OF DANVILLE CIRCUIT COURT

**RAJPAUL SINGH TOOR, MD,**

    **Plaintiff,**

v.                                                                                                 Case No.

**DANVILLE REGIONAL
MEDICAL CENTER, LLC, D/B/A
SOVAH HEALTH DANVILLE**

**Serve:**
    **R/A CT Corporation System**       **JURY TRIAL DEMAND**
    **4701 Cox Road, Suite 285**
    **16th Floor**
    **1111 East Main Street**
    **Glen Allen, VA  23060**

**and**

**LIFEPOINT HEALTH, INC.,**

**Serve:**
    **R/A CT Corporation System**
    **300 Montvue Road**
    **Knoxville, TN  37919**

    **Defendants.**

### COMPLAINT

The above-named Plaintiff, Rajpaul Singh Toor, MD (hereinafter, "Dr. Toor" or "Plaintiff"), by counsel, states as his Complaint against Defendant Danville Regional Medical Center, LLC, d/b/a SOVAH Health Danville (hereinafter, "SOVAH"), and Defendant LifePoint Health, Inc. (hereinafter, "LifePoint", collectively, "Defendants"), the following:

## I. JURISDICTION AND VENUE

1. Plaintiff Dr. Toor, is a former resident of Danville, Virginia. For all times pertinent to this matter, Dr. Toor was domiciled in Danville, Virginia.

2. Defendant Danville Regional Medical Center, LLC, is a Delaware corporation authorized to transact business in the Commonwealth of Virginia. Danville Regional Medical Center, LLC, operates under its registered fictitious name, SOVAH Health Danville.

3. Defendant Lifepoint Health, Inc., is incorporated in the State of Delaware, and does business within the Commonwealth of Virginia. LifePoint's headquarters is located in Brentwood, Tennessee. Therefore, due to its contacts within the Commonwealth, LifePoint avails itself to the jurisdiction of this Court.

4. This Court has jurisdiction over this matter as it arises under Virginia statutes and common law.

5. Venue is permissible in this Court under Va. Code § 8.01-262(2) [or (3) is Danville City Circuit].

6. The events which led to this lawsuit occurred in Danville, Virginia and all causes of action related to this suit arose under Virginia law.

7. Danville Regional Medical Center is located at 142 South Main Street, Danville, Virginia, 24541, and its registered agent's office is in Henrico County, Virginia.

## II. FACTUAL ALLEGATIONS

### A. Dr. Toor Joins SOVAH

8. Danville Regional Medical Center, LLC, operates the hospital known as Danville Regional Medical Center, under its registered fictitious name, SOVAH Health Danville, and owns a number of affiliated physician practices.

9. Defendant Lifepoint Health, Inc., is a holding company of affiliated entities which own and operate hospitals and other healthcare providers in more than 70 communities throughout the United States.

10. Lifepoint has an established practice of working with an intentionally "hands-on" approach regarding joint-performance of shared duties with LLCs such as SOVAH. The entities share numerous functioning aspects. For example, Lifepoint has personnel that possess supervisory authority over personnel purportedly only employed by SOVAH.

11. Lifepoint and SOVAH share administrative personnel, functions, roles, use of assets and otherwise at times, often work as a single entity despite numerous corporate creations purportedly separating the parties.

12. The interplay and interconnections between the Defendants is multi-layered and operates continuously. Personnel from both Defendants routinely work together and make joint employment decisions including hiring, firing, the issuance of disciplinary actions, and determinations to renew or not renew employment contracts for personnel such as Dr. Toor.

13. Throughout Dr. Toor's employment, he was jointly employed by both entities as a matter of law and as pertinent to these proceedings.

14. Dr. Toor worked for Defendants from September 27, 2021, until his unlawful termination from employment on April 4, 2022.

15. Approximately one-third of SOVAH Danville's patients qualify for and use Medicare/Medicaid benefits to obtain medical care.

16. At all times relevant, Dr. Toor was a physician with a training license in internal medicine at SOVAH Hospital in Danville, Virginia.

17. Graduates of medical school, such as Dr. Toor, who wish to practice internal

medicine in the United States must complete a three-year, ACGME (Accreditation Council for Graduate Medical Education) accredited residency employment program. Successful completion of the three-year residency employment program is a critical step in the physician's career path.

18. SOVAH has had an ACGME accredited residency program since 2010.

19. Accredited residency programs must follow ACGME policies and procedures to maintain their accreditation.

20. All ACGME accredited programs must have a program director. *See* ACGME Program Director Guide: Residency, II.A.1, online at https://www.acgme.org/globalassets/pdfs/program-director-guide---residency.pdf. At all times relevant, SOVAH's program director was Dr. Byrd.

21. All ACGME accredited programs must have a GME "point person." Upon information and belief, SOVAH did not identify a GME "point person."

22. Participants in SOVAH's residency program enter into successive, one-year contracts of employment with SOVAH. Each contract obligates physicians such as Dr. Toor to provide medical care and professional services to SOVAH's patients under the supervision of more experienced and board-certified health care practitioners. In exchange for the physician's services, he or she receives compensation in the form of salary and benefits and clinical training.

23. By its terms, this residency contract can be terminated for cause in certain specific circumstances.

24. Dr. Toor was hired by SOVAH on or about September 27, 2021.

25. Dr. Toor entered SOVAH's medical residency program as a second-year resident ("2Y"), two months after the beginning of the program year, replacing another resident

whom the program dismissed.

26. Because he joined the program mid-year, Dr. Toor completed his orientation with the nurses and general staff—not the other residents. He also had to repeat many of the "modules" the residents had completed in orientation before his arrival.

### B. Dr. Toor Witnesses and Reports Illegal Up-Charging and Unsafe Practices at SOVAH: Examples

27. Beginning in his first internal medicine rotation, Dr. Toor observed illegal and unethical up-charging/up-billing practices at SOVAH.

28. Specifically, Dr. Toor observed that SOVAH assigned patients to the more costly Intensive Care Unit, when they were not in critical condition, as evidenced by the fact that these patients were discharged directly from the ICU, rather than being first downgraded to regular hospital care prior to dismissal.

29. Dr. Toor observed that patient medical conditions were coded to the most expensive category or possible diagnosis regardless of what the written protocols or the standard of medical care in Virginia required. Dr. Toor was told by supervising doctors, including Dr. Baral, Dr. Taylor, and Dr. Gunn to code in this way. Dr. Toor clearly objected to this practice.

30. In one case, a patient developed a urinary tract infection after being admitted to the hospital. Lawful billing practices would require that infections that develop after a patient has already been admitted to the hospital should not be billable to the patient. SOVAH sought to operate around this at the disservice of the patient and taxpayers. SOVAH's practice here was emblematic of its operations as a whole. However, SOVAH's established practice as enforced by the administration and management was to record infections that developed after admission as having manifested before admission so as to

make the cost for treatment of the infection billable to the patient and, thus, taxpayers that fund necessary medical assistance programs.

31. For this particular patient, Dr. Toor refused to follow this model of fraud. Dr. Toor documented the UTI, but he told Supervising Physician Dr. Gunn that he refused to document the patient as having had the UTI prior to admission, as was SOVAH's normal practice, since treatment for the UTI would not be billable to the patient if the infection occurred in the hospital.

32. As another example, SOVAH documented most patients as having acute toxic-metabolic encephalopathy, regardless of whether the diagnosis applied, in order to charge for treating it. Dr. Toor routinely pushed back and objected to this diagnosis noting that the patient did not manifest the required symptoms or that the symptoms had another, simpler cause.

33. Throughout September and October of 2021, Dr. Toor routinely objected to these up-billing practices in conversations with his attending physicians and those with supervisory capacity above him within the management structure of his employer.

34. Dr. Toor also noted that the night shift at the hospital was often staffed by residents alone—with no attending physician to supervise. This practice directly violated the SOVAH Residency Policy Manual, which requires that "[o]n inpatient services, [even] senior residents round with the inpatient teaching faculty physician who is onsite and supervises patient care, personally sees, and examines and patients and teaches the residents *throughout the day or night.*" SOVAH Residency Policy Manual 3.14, p. 14.

35. Dr. Toor believes this lack of supervision put patients and employees at great risk and violated his duties of patient care. Dr. Toor raised this issue to management as well.

**C. Defendants Retaliate**

36. As a result of Dr. Toor's legitimate complaints about SOVAH's up-billing and other unsafe practices, Dr. Byrd, Dr. Taylor, and Dr. Gunn, all acting in concert as agents of Defendants, retaliated against Dr. Toor first by declaring that his documentation was inaccurate and lacked thoroughness.

37. This attack on Dr. Toor's documentation was unmerited as at least one supervising physician on his ICU commented that Dr. Toor's notes were better than most of the third-year residents in the program.

38. Defendants retaliated further, requiring Dr. Toor to repeat rotations that he had already "passed."

39. Dr. Taylor, one of the proponents of up-billing for Defendants, routinely called Dr. Toor "autistic."

40. Dr. Gunn became aggressive toward Dr. Toor, often shouting profanities at him.

41. On January 28, 2022, Dr. Byrd and program coordinator, Laurie Galvez, met with Dr. Toor and informed him for the first time that his "assignments" were late, penalizing him for not completing quizzes that he was never assigned.

42. Dr. Byrd put Dr. Toor on a remediation plan that was utterly pretextual and required him to repeat his internal medicine rotation—even though his performance was in no way subpar.

43. On February 21, 2022, Dr. Toor was ill and scheduled for a neurology rotation. He contacted his attending physician to advise the attending physician that he would not be able to come in that day.

44. It is established practice at SOVAH for a resident to notify his attending physician if he cannot come into the hospital due to sickness.

45. Prior to this date, Dr. Toor had never called in sick.

46. Despite this rare occurrence, and despite the fact that Dr. Toor had followed common and accepted practice of notifying his attending physician, Dr. Byrd told Dr. Toor that calling in sick on the day he was required to be at work is considered a voluntary resignation from the program.

47. As a result of Dr. Toor's alleged breach of policy, Dr. Byrd tried to intimidate him into admitting that he had resigned from the program. Dr. Toor refused.

48. In response, Dr. Byrd accused Dr. Toor of falsely claiming to be sick.

**D. Wrongful Termination**

49. On March 14, 2022, Dr. Toor began a new internal medicine rotation under Dr. Gunn, who was the supervising attending physician.

50. By this time, a third-year resident was assigned to Dr. Toor to "break him in." This 3Y resident appeared not to have her own patient care load but, instead, was tasked with micromanaging Dr. Toor's work and constantly interrupting and re-tasking him.

51. Dr. Gunn would often leave the hospital early, necessitating her consultations with residents be done over the phone, while she was driving.

52. During one such distracted interchange between Dr. Gunn and Dr. Toor, there was a miscommunication about the status of a particular patient, resulting in confusion about whether or not the patient's bowel was obstructed, and what the course of action should be.

53. Dr. Toor initiated a plan for patient care based upon directions he received from Dr. Gunn as she was driving home, but Dr. Gunn later maintained that she gave no such directions. This was false and intentional.

54. Alleging that Dr. Toor disregarded Dr. Gunn's instructions, Dr. Byrd placed Dr. Toor on leave with pay beginning March 16, 2022.

55. This suspension was pretextual and a direct result of Dr. Toor's complaints about Defendants' up-billing practices, and the miscommunication between Dr. Toor and Dr. Gunn was merely a pretext to terminate Dr. Toor's employment.

56. On March 31, 2022, Defendants formally terminated Dr. Toor from the residency program, allegedly due to concerns about patient safety.

57. Dr. Toor appealed the termination decision, citing his repeated complaints about up-billing and the concerns he vocalized about lack of supervision for residents on night shift in the ICU.

58. By letter of June 13, 2022, Defendants rejected Dr. Toor's appeal and dismissed him from the residency program.

59. Dr. Toor had no need to exhaust appellate procedures as a requisite to initiating this action, however, Dr. Toor has exhausted all available appellate and administrative procedures available to him to contest the decisions of Defendants.

### COUNT I: BREACH OF CONTRACT AGAINST DEFENDANT SOVAH

60. Dr. Toor incorporates by reference herein the preceding paragraphs of this Complaint.

61. For good and valuable consideration, Dr. Toor and SOVAH entered into the residency contract. SOVAH maintains a copy of this contract and, despite his requests, refused to provide a copy of the contract to Dr. Toor.

62. SOVAH breached this contract by terminating Dr. Toor's employment without a legitimate concern for reasons protected under law, as the reasons given for Dr. Toor's termination were pretextual.

63. SOVAH had no contractual obligation, basis, or legitimate support to terminate Dr. Toor's employment for cause. In the event that SOVAH claims — falsely — that

SOVAH terminated Dr. Toor without cause, SOVAH violated the procedural terms of the contract related to the mandatory notice and curing provisions contained within Dr. Toor's contract.

64. SOVAH's termination of Dr. Toor violated SOVAH's duties of continued employment contained within the contract between the parties and resulted in economic and non-economic damages to Dr. Toor including lost wages, benefits, and substantial harm to his reputation.

65. Dr. Toor did not engage in any act or omission that would justify his termination from employment under the terms of the contract between the parties. When SOVAH terminated Dr. Toor's employment, this resulted in a material breach of the contract.

66. As a direct and proximate result, Dr. Toor has suffered and will continue to suffer pecuniary loss.

### COUNT II: TERMINATING EMPLOYMENT IN VIOLATION OF VA. CODE § 40.1-27.3 (AGAINST BOTH DEFENDANTS)

67. Dr. Toor incorporates by reference the preceding paragraphs of this Complaint.

68. At all times, Dr. Toor was an employee of Defendants.

69. Defendants regularly up-billed/up-charged (or "up-coded" as the term is used in the medical industry) by coding patient maladies to the most expensive possible category, and Defendants urged Dr. Toor to do the same. Dr. Toor contested these "diagnoses."

70. Additionally, Defendants commonly back-dated patient infections which actually occurred in the hospital, so that they would be billable as pre-existing conditions. Defendants urged Dr. Toor to do this as well, but he refused.

71. Defendants also filled the ICU first, designating non-critical patients as requiring "critical care."

72. These unethical and illegal practices affected all patients, including insured patients, cash-pay patients, Medicare and Medicaid patients, and patients whose medical care is covered at least in part by funds from the Commonwealth of Virginia and the federal government.

73. At least some of Defendants' patients who were up-charged for medical services performed by Defendants and its employees were Medicare and Medicaid patients.

74. At least some of Defendant's patients who were up-charged for medical services performed by Defendants and its employees were patients whose medical care is covered at least in part by funds from the Commonwealth of Virginia.

75. Up-charging or falsifying billing for Medicare and Medicaid patients is a violation of the False Claims Act, codified at 31 U.S.C. § 3729.

76. Up-charging or falsifying billing for patients whose medical care is covered at least in part by funds from the Commonwealth of Virginia is a violation of the Virginia Fraud Against Taxpayers Act, codified at Va. Code § 8.01-216.1, *et seq.*

77. The Defendants' regular practice of staffing the night shift with unsupervised residents was contrary to Defendants' policies and the state regulation requiring that a resident "shall be responsible and accountable at all times to a fully licensed member of the faculty where the [residency] is served." 18 VAC 85-20-220. This situation was also unsafe for patients.

78. Va. Code § 40.1-27.3 states that "[a]n employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee: . . .

1. [r]eports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official;

2. [r]efuses to engage in a criminal act that would subject the employee to criminal liability;

3. [r]efuses an employer's order to perform an action that violates any federal or state law or regulation and the employee informs the employer that the order is being refused for that reason."

79. Defendant terminated Dr. Toor in retaliation for Dr. Toor's refusal to up-code services on patient records that would be billed to insurance companies, cash-pay patients, the federal government, and the Commonwealth of Virginia and for his reports to his supervisors concerning the violations of federal and state law and regulations.

80. Dr. Toor was adequately performing his job at the time of the termination of his employment and any other reason offered by Defendant for his termination is pretextual. Dr. Toor was meeting all legitimate expectations of his employer.

81. The termination of Dr. Toor's employment violated Va. Code § 40.1-27.3.

82. As a direct and proximate result of the termination of Dr. Toor's employment, Dr. Toor has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to professional reputation, and other non-pecuniary losses.

83. Pursuant to Virginia Code § 40.1-27.3, Dr. Toor is entitled to "(i) an injunction to restrain continued violation of this section, (ii) the reinstatement of [his employment pursuant to his contract], and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs."

WHEREFORE, Plaintiff Rajpaul Singh Toor, M.D., demands judgment against Defendant, Danville Regional Medical Center, LLC, d/b/a SOVAH Health Danville, and Defendant Lifepoint Health, Inc., jointly and severally, for actual and consequential damages, , lost wages and earnings, backpay, front pay, all damages permitted by Dr. Toor's contract, all with pre- and post-judgment interest, as well as reasonable attorneys' fees and costs, in the amount of TWENTY MILLION DOLLARS ($20,000,000.00) or such sum as may be shown by the evidence; and for such other and further relief as justice may require.

Trial by jury is demanded on all matters which may be tried including the existence of an enforceable arbitration agreement.

Respectfully submitted,

**RAJPAUL SINGH TOOR, M.D.**

By /s/

Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
Brittany M. Haddox, Esq. (VSB # 86416)
Monica L. Mroz, Esq. (VSB #65766)
STRELKA EMPLOYMENT LAW
4227 Colonial Ave.
Roanoke, VA 24018
Tel: 540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com
brittany@strelkalaw.com
monica@strelkalaw.com

*Counsel for Plaintiff*